**REDACTED**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EASTMAN KODAK COMPANY,

Plaintiff,

v.

ALTEK CORPORATION,

Defendant.

Case No. 12-CV-246 (DLC)

**MEMORANDUM OF LAW IN SUPPORT OF EASTMAN KODAK COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THE VALIDITY AND INTERPRETATION OF THE PLA**

Robert J. Gunther, Jr.
Wilmer Cutler Pickering Hale & Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 230-8800
Fax: (212) 230-8888
robert.gunther@wilmerhale.com

Michael J. Summersgill (*pro hac vice*)
Jordan L. Hirsch (*pro hac vice*)
Jonathan W. Woodard (*pro hac vice*)
Wilmer Cutler Pickering Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109
Tel: (617) 526-6000
Fax: (617) 526-5000
michael.summersgill@wilmerhale.com
jordan.hirsch@wilmerhale.com
jonathan.woodard@wilmerhale.com

*Attorneys for Eastman Kodak Company*

**REDACTED**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

I. INTRODUCTION .......... 1

II. UNDISPUTED FACTUAL BACKGROUND .......... 3

A. Altek Agreed To Pay Royalties For A License To Kodak's Digital Camera Patent Portfolio. .......... 3

B. The PLA Requires Royalty Payments To Be Based on Altek's Sales .......... 5

C. Altek Has Improperly Used Section 4.14 To Avoid Paying Royalties On Virtually All Of Its Digital Camera Sales. .......... 7

III. ARGUMENT .......... 8

A. Based On The Plain Language Of The PLA, "Open Market Price" In Section 4.14 Means Altek's Price On The Open Market To Its Commercial Customers. .......... 9

B. Altek's Proposed Contract Interpretation Is Wrong On The Facts And Law. .......... 11

C. Altek Cannot Escape Its Obligations Under the PLA By Arguing For The First Time After Eight Years That The PLA Is Invalid. .......... 14

IV. CONCLUSION .......... 17

**REDACTED**

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82 (2d Cir. 1998)....8

*Cauff, Lippman & Co. v. Apogee Finance Group, Inc.* 807 F. Supp. 1007 (S.D.N.Y. 1992)....15

*Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557 (2d Cir. 2011)....8

*Interactive Motorsports and Entertainment Corp. v. Dolphin Direct Equity Partners, LP*, 419 Fed. Appx. 60 (2d Cir. 2011)....8

*Leighton Techs. LLC v. Oberthur Card Sys., S.A.*, 358 F. Supp. 2d 361 (S.D.N.Y. 2005)....9

*Lomaglio Assocs. Inc. v. LBK Marketing Corp.*, 892 F. Supp. 89 (S.D.N.Y. 1995)....14

*Maryland Cas. Co. v. W.R. Grace & Co.*, 128 F.3d 794 (2d Cir. 1997)....9

*PB Americas Inc. v. Cont'l Cas. Co.*, 690 F. Supp. 2d 242 (S.D.N.Y. 2010)....16

*Post v. Killington, Ltd.*, 424 F. Appx. 27 (2d Cir. 2011)....9

*Reefer & Gen. Shipping Co., Inc. v. Great White Fleet, Ltd.*, 922 F. Supp. 935 (S.D.N.Y. 1996) *aff'd,* 107 F.3d 4 (2d Cir. 1997)....11

*Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616 (S.D.N.Y. 2010)....12

*Waldman ex rel. Elliott Waldman Pension Trust v. Riedinger*, 423 F.3d 145 (2d Cir. 2005)....13

*Walter E. Heller & Co., Inc. v. Am. Flyers Airline Corp.*, 459 F.2d 896 (2d Cir. 1972)....16

**REDACTED**

Eastman Kodak Company ("Kodak") respectfully submits this memorandum in support of its Motion for Partial Summary Judgment regarding the validity and interpretation of the July 1, 2004 Patent License Agreement ("PLA") between Kodak and Altek Corporation ("Altek").

## I. INTRODUCTION

Kodak granted Altek a license to Kodak's portfolio of digital camera patents and, in return, Altek agreed to pay royalties on all covered digital camera sales, including its sales as an Original Equipment Manufacturer "(OEM") (defined in the PLA as "OEM Licensed Products"). (Ex. 1, PLA at § 4.10.)[1] This dispute involves the interpretation of a provision of the PLA—Section 4.14—that provides a narrow exception to Altek's royalty payment obligations for its OEM sales. Section 4.14 provides that Altek need not pay royalties when it makes certain OEM sales on a "contract assembly" basis. Specifically, it provides an exception to Altek's OEM royalty obligation when the revenues that Altek receives from such contract assembly sales are less than 50 percent of the "open market price" of Altek's digital cameras. (*Id*. at § 4.14.)

Altek argues that "open market price" means the *retail price* that Altek's *customers* charge when they re-sell the digital cameras to consumers on the retail market and that, as a result, this provision effectively permits Altek to pay ***no*** royalties to Kodak on any of its sales. For at least the following reasons, "open market price" should be interpreted as the price that ***Altek*** charges for an open market sale to its commercial customers, not the "retail price."

***First***, the plain language of the PLA confirms that "open market price" is the price that ***Altek*** charges through an arms-length sale. The first time the PLA mentions "open market price" (Section 1.13), it specifically refers to *Altek's* open market price:

> In the case of a sale or disposal of a [licensed product] that has not been sold in an arms length transaction, Net Sales [subject to the royalty requirement] shall mean

[1] Exhibits 1-10 refer to exhibits to the Declaration of Jonathan Woodard in support of Kodak's Motion for Partial Summary Judgment

**REDACTED**

> ***Altek's open market price*** for such [] Product in the country of sale on the date when such sale occurred . . . .

(*Id.* at 1.13(b)(2) (emphasis added).) Section 4.14, the contract assembly provision, then refers to "***the*** open market price"—making clear that it is describing the same open market price referenced earlier in the agreement. In fact, even Altek concedes that "open market price" must have the same meaning in Section 4.14 as it does in Section 1.13:

> Q: Now—and it's your position—it's Altek's position that open market price in 1.13 means the same thing as open market price in paragraph 4.14, correct?
>
> A: Yes.

(Ex. 2, Transcript of Altek 30(b)(6) Deposition ("Lin Dep. Tr.") at 201:18-22.)

***Second***, it is undisputed that Altek does not sell (and has never sold) digital cameras on the retail market. (*Id.* at 64:20-22 ("Q. Was Altek selling any digital cameras directly to the end users? A. No, never.").) Instead, it only sells digital cameras to commercial OEM customers—companies that re-sell the cameras under their own brand name. ***Altek's*** open market price, therefore, can only be the price that Altek charges when it makes sales on the open market to its OEM customers.

***Third***, Altek's interpretation would eviscerate the purpose of the PLA. If "open market price" means "retail price," as Altek now asserts, Altek contends that virtually all of its sales since the signing of the PLA would qualify as exempted "contract assembly" sales. If that were the case, there never would have been any reason to enter into the PLA.

Unable to point to any support in the PLA for its "retail price" argument, Altek further asserts that the PLA is invalid because its Board of Directors never approved the agreement. This argument is equally flawed. It is settled law that Altek cannot use its own alleged failure to obtain its Board's approval to escape its obligations under the PLA. Moreover, Altek's conduct

**REDACTED**

over the last eight years confirms that even Altek understood the PLA to be valid and enforceable. It is undisputed that, since the PLA was executed in 2004, Altek:

- Paid royalties to Kodak under the PLA (albeit in the wrong amount);
- Confirmed that the terms of the PLA are in "full force and effect" in two separate amendments to the PLA (Ex. 4, Amendment 1 to the PLA; Ex 5, Amendment 2 to the PLA).
- Submitted to an audit of its royalty payments pursuant to the PLA;
- Never told Kodak that its Board of Directors allegedly did not approve the PLA (Ex. 3, Second Supplemental Responses to Kodak's Requests for Admission No. 1); and
- Never asserted to Kodak that the PLA was invalid (Ex. 3, Second Supplemental Response to Kodak's Request for Admission No. 2);

Accordingly, as set forth below, Kodak respectfully requests that the Court: (i) construe "open market price" in Section 4.14 of the PLA to mean *Altek's* open market price to its customers; and (ii) find that the PLA is valid and enforceable.

## II. UNDISPUTED FACTUAL BACKGROUND

### A. Altek Agreed To Pay Royalties For A License To Kodak's Digital Camera Patent Portfolio.

Kodak invented the digital camera in 1975 and invested billions of dollars into the research and development of digital imaging technology. This investment lead to many foundational inventions that resulted in more than 1,000 Kodak patents in the field of digital imaging. Kodak has licensed this portfolio to dozens of digital camera manufacturers around the world.

Altek agreed to license Kodak's digital camera patent portfolio in 2004. Under the PLA, Altek obtained rights to Kodak's entire digital camera patent portfolio. (Ex. 1, PLA at §§ 1.8 ("'Kodak Patents' shall mean all classes or types of patents … in all countries of the world which are owned or licensable by Kodak…"), 3.1(a) ("Subject to the obligation of Altek to make the

**REDACTED**

[royalty] payment as specified in Article 4 hereof, Kodak … hereby grants and agrees to grant to Altek … a non-exclusive, non transferrable license … to practice any method or process involved in the manufacture, testing or use [of Licensed Products], under Kodak Patents.").) In return, Altek agreed to pay royalties for its use of Kodak's patented digital camera technology. (*Id*. at § 4.2(a) ("… it is agreed that Altek shall pay to Kodak a commuted royalty…").)

The royalty requirements of the PLA are straightforward:

- First, Altek is licensed to sell digital cameras as an original equipment manufacturer (OEM) to customers that re-sell the cameras under their own brand name. These are referred to as "OEM Licensed Products." (*Id*. at § 1.14.)[2]

- Second, the PLA defines the "Net Sales" of OEM Licensed Products as the total revenues that Altek receives from arms-length sales. (*Id*. at § 1.13(b)(1) ("In the case of an arms length sale or other disposal of an OEM Licensed Product… Net Sales shall mean the total net revenue received by Altek and its Subsidiaries resulting from the sale or placement of such OEM Licensed Product...").)

- Finally, the PLA states that Altek must pay a [REDACTED] royalty on the "Net Sales" of its digital cameras to its OEM customers. (*Id.* at § 4.2.)

Accordingly, Altek agreed to pay to Kodak [REDACTED] of all revenues that it receives from covered digital camera sales on the OEM market. (*Id.*)

The PLA was executed as of July 1, 2004. (*Id*. at 1 ("This Agreement is made as of the 1st day of July 2004"); § 1.5 (effective date "shall be July 1st, 2004").) The agreement was signed on behalf of Kodak by Willy Shih, a former Kodak Senior Vice President. (*Id*. at 20.) Mr. Alex Hsia, Altek's President, signed the PLA on behalf of Altek. (*Id*.) The agreement is governed by New York law (*id.* at § 9.6.) and is effective until June 30, 2013 (*id.* at § 6.1.).

---

2 Altek is also licensed to sell digital cameras under its own brand name. (Ex. 1, PLA at § 1.1.) It is undisputed, however, that Altek has never sold any such cameras to the retail market. (Ex. 2, Lin Dep. at 64:20-22 ("Was Altek selling any digital cameras directly to the end users? A. No, never.").)

3 This rate was later changed by written amendment to a [REDACTED] royalty on all Net Sales of OEM Licensed Products. (Ex. 5, Amendment 2 to the PLA.)

**REDACTED**

**B. The PLA Requires Royalty Payments To Be Based on Altek's Sales**

The PLA repeatedly provides that the sales that trigger Altek's royalty payments are *Altek's* sales:

- Section 1.13 defines the Net Sales on which Altek must pay royalties as the price that ***Altek*** receives (Ex. 1, PLA at § 1.13(b)(1) ("… Net Sales shall mean the total net revenue received ***by Altek*** and its Subsidiaries…")) (emphasis added);

- Section 4.4 states that the sales that trigger the royalty requirement are sales that ***Altek*** makes (*id*. at § 4.4 ("For the purpose of this Agreement, Altek Branded Licensed Product and OEM Licensed Products shall be considered sold when invoiced ***by Altek.***")) (emphasis added); and

- Section 4.10 states that the PLA is intended to cover all sales made "***by Altek***" (*id*. at § 4.10 ("It is intended that under this Agreement Altek shall pay a royalty on all Digital Cameras sold or transferred by Altek…")).

It is undisputed that Altek's digital camera sales are made to its commercial OEM customers and that it has ***never*** sold digital cameras to end users on the retail market:

Q. Was Altek selling any digital cameras directly to the end users?

A. No, never.

* * *

Q. Mr. Lin, just so we're clear, Altek doesn't sell its digital cameras directly to retail consumers, correct?

…

A. That's correct.

(Ex. 2, Lin Dep. Tr. at 64:20-22, 65:22-66:2.) Altek's digital cameras reach the retail market only when one of Altek's OEM customers re-sells the cameras to retail customers. (*Id.* at 65:7-10 ("Q. [Altek] doesn't sell its digital cameras to retail customers, correct? A. There's always one company … between us and the end consumer.").)

The first time the PLA uses the term "open market price" is in Section 1.13, which states that when Altek makes an arms-length sale, Net Sales are all the revenues that Altek receives.

**REDACTED**

(*Id.* at § 1.13(b)(1).) It then states that when Altek makes a sale that is *not* arms-length, Net Sales are based on "*Altek's open market price*" for OEM sales:

> In the case of an arms length sale or other disposal of an OEM Licensed Product … Net Sales shall mean the total net revenue received by Altek and its Subsidiaries resulting from the sale or placement of such OEM Licensed Product …
>
> In the case of a sale or disposal of an OEM Licensed Product which has not been sold in an arms length transaction, Net Sales shall mean ***Altek's open market price*** for such OEM Licensed Product in the country of sale on the date when such sale occurred ….

(*Id*. at § 1.13(b)(1)-(2) (emphasis added).) "Altek's open market price" is thus a proxy for what Altek would have received through an arms-length sale. Accordingly, the term "open market price" is used specifically to refer to *Altek's* open market price on the OEM market.

Section 4.14—the contract assembly provision—then refers to "***the*** open market price," making clear that it refers to the same "open market price" set forth in Section 1.13. Specifically, Section 4.14 states that no royalties are due on "contract assembly" sales in which Altek sells a digital camera to an OEM customer for less than fifty percent of "***the*** open market price":

> This paragraph is intended to exclude from OEM Licensed Products those Digital Cameras that Altek makes or sells on a 'contract assembly' basis, as defined below. For purposes of this Agreement a Digital Camera is a 'Contract Assembly Digital Camera' if and only if the Net Sales collected or received by Altek for said Digital Cameras is less than fifty-percent (50%) of ***the*** open market price . . .

(*Id.* at § 4.14 (emphasis added).)

Indeed, it is undisputed that the use of the term "open market price" in Section 4.14 has the same meaning as is set forth in Section 1.13:

> Q: Now -- and it's your position -- it's Altek's position that open market price in 1.13 means the same thing as open market price in paragraph 4.14, correct?
>
> A: Yes.

**REDACTED**

(Ex. 2, Lin Dep. Tr. at 201:18-22.)

The only other provision of the PLA to use the term "open market price" is Section 4.8. Like Sections 1.13 and 4.14, Section 4.8 provides that "open market price" refers to Altek's price. It states that Altek will record in royalty reports that it sends to Kodak the "open market price" for "all Digital Cameras sold or disposed of ***by Altek***":

> Altek warrants that all Digital Cameras sold or disposed of by Altek or its Subsidiaries anywhere in the world before or during the Term (as hereinafter defined) of this Agreement will be accurately recorded as an entry in Altek's financial records, and such records shall be accurately reflected in the royalty reports and Net Sales, at an open market price in the country of sale…

(*Id*. at § 4.8.)

The PLA never refers to the "retail price" of digital cameras nor mentions the "retail market."

**C. Altek Has Improperly Used Section 4.14 To Avoid Paying Royalties On Virtually All Of Its Digital Camera Sales.**

In 2010, Kodak learned that Altek had been using Section 4.14 to withhold millions of dollars in royalties without telling Kodak. Specifically, Altek has taken the position that "open market price" refers to the *retail price* received by Altek's OEM customers when they re-sell the digital cameras they buy from Altek.[4] Based on this interpretation, Altek has refused to pay royalties on any digital cameras that its customers sell on the retail market for more than 50 percent of what Altek charged for the OEM sale—

[4] Altek has also asserted that "open market price" can refer to the retail price received by distributors or retail stores who purchase digital cameras from Altek's OEM customers.

**REDACTED**

Kodak filed this complaint in January 2012 asserting that Altek breached the terms of the PLA by withholding royalties on these sales. (Dkt. 1, Complaint at ¶¶ 24-27, 47-50.) In June 2012, the Court set a three-phase schedule for discovery. (Dkt. 36, June 25, 2012 Discovery Order at 4.) The parties were required to complete targeted discovery relating to the interpretation of the PLA by November 2, 2012. (*Id.*)[5] The parties could then request that the Court resolve the proper interpretation of the PLA on summary judgment. (*Id.*) And finally, after summary judgment is resolved, the parties may conduct discovery relating to liability and damages. (*Id.*)

The targeted discovery phase of the case is now complete. The proper interpretation of PLA is thus ripe for resolution by the Court.

## III. ARGUMENT

Summary judgment is appropriate where there are no genuine issues of material fact that must be resolved at trial. *See Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 566 (2d Cir. 2011) ("Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.") (internal citations and quotations omitted). Contract interpretation is an issue of law that is appropriate for summary judgment where the terms of the contract are clear. *See Interactive Motorsports and Entertainment Corp. v. Dolphin Direct Equity Partners, LP*, 419 Fed. Appx. 60, 61-62 (2d Cir. 2011) ("Interpretation of the terms of a legally binding agreement, such as a contract, are questions of law and therefore appropriate for summary judgment."); *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998)

---

5 The discovery deadline was subsequently extended until January 22, 2013 for the limited purpose of conducting a second Rule 30(b)(6) deposition of Kodak, and the summary judgment deadline was reset to February 1, 2013. (Dkt. 49, December 7, 2012 Order extending discovery and summary judgment briefing schedule.)

**REDACTED**

(same). Summary judgment is appropriate here because, although the parties disagree about the meaning of the term "open market price," even Altek agrees that the term is not ambiguous. (Ex. 2, Lin Dep. Tr. at 187:19-22 (the term "open market price" is "very clear"). Based on the plain language of the PLA, the only reasonable interpretation of "open market price" as used in Section 4.14 is the price that *Altek* receives through an open market sale.

### A. Based On The Plain Language Of The PLA, "Open Market Price" In Section 4.14 Means Altek's Price On The Open Market To Its Commercial Customers.

The plain language of the PLA establishes that the term "open market price" refers to the open market price that ***Altek*** charges for its commercial sales. The first time the PLA uses the term "open market price" it specifically refers to "*Altek's open market price*." (Ex. 1, PLA at § 1.13(b)(2) ("Net Sales shall mean Altek's open market price…").) Section 4.14 then refers to "***the***" open market price—making clear that it is referring to the same open market price (Altek's open market price) referenced earlier. (*Id.* at § 4.14 ("a Digital Camera is a 'Contract Assembly Digital Camera' if and only if the Net Sales collected or received by Altek for said Digital Cameras is less than fifty percent (50%) of ***the*** open market price.") (emphasis added).)

It is a well-established principle of contract interpretation that the use of the word "the" before a previously used phrase refers back to the previous use of the phrase. *See Leighton Techs. LLC v. Oberthur Card Sys., S.A.*, 358 F. Supp. 2d 361, 384 (S.D.N.Y. 2005) (stating the "rule of law" that "the definite article 'the' particularizes the subject and narrows the possible class of possible antecedents" to a specific, previously defined word); *Post v. Killington, Ltd.*, 424 F. Appx. 27, 29-30 (2d Cir. 2011) (use of "the corporation" as opposed to "a corporation" refers back to the previously identified corporate owners).

In fact, Altek concedes, as it must, that the term "open market price" has the same meaning in Section 4.14 as it does in Section 1.13. (Ex. 2, Lin Dep. Tr. at 201:18-22 ("Q: Now -

**REDACTED**

- and it's your position -- it's Altek's position that open market price in 1.13 means the same thing as open market price in paragraph 4.14, correct? A: Yes")); *see Maryland Cas. Co. v. W.R. Grace & Co*., 128 F.3d 794, 799 (2d Cir. 1997) ("Terms in a document . . . normally have the same meaning throughout the document in the absence of a clear indication that different meanings were intended").

It is undisputed that Altek only sells digital cameras to commercial customers—it has never sold digital cameras to the retail market. (Ex. 2, Lin Dep. Tr. at 64:20-22 ("Q. Was Altek selling any digital cameras directly to the end users? A. No, never.").) "***Altek's*** open market price," therefore, can only be the price that Altek charges when it makes sales on the open market to its commercial customers. The term "open market price" as used in Section 4.14 is thus the price that ***Altek*** charges through a typical open market sale to its OEM customers.

The remaining provisions of the PLA confirm that the "open market price" referenced in Section 4.14 is *Altek*'s price. Section 4.8—the only provision other than Sections 1.13 and 4.14 to refer to "open market price"—also uses the term to refer to sales that *Altek* makes. (Ex. 1, PLA at § 4.8 (requiring Altek to report the "open market price" of the digital cameras *sold by Altek*.) Likewise, each of Sections 1.13, 4.4, and 4.10 states that the royalty determination is based on the revenues that *Altek* receives. (*Id.* at §§ 1.13(b)(1) ("Net Sales shall mean the total net revenue received *by Altek*"); 4.4 (For the purpose of this Agreement … OEM Licensed Products shall be considered sold when invoiced *by Altek*") (emphasis added); 4.10 ("It is intended that under this Agreement Altek shall pay a royalty on all Digital Cameras sold or transferred *by Altek*…") (emphasis added).) The only proper way to read Section 4.14 to be consistent with these provisions is to interpret "open market price" to refer to the price that *Altek* receives from an open market sale.

**REDACTED**

**B. Altek's Proposed Contract Interpretation Is Wrong On The Facts And Law.**

Altek's assertion that "open market price" means the *retail price* that Altek's *customers* charge on the retail market is incorrect for multiple reasons.

***First***, Altek's interpretation is contrary to the plain language of the PLA. Altek's argument is premised on the assumption that the only "open market" is the *retail* market. But the PLA specifically states that "open market price" refers to "***Altek's*** open market price," and it is undisputed that Altek only sells digital cameras to its commercial customers. (Ex. 1, PLA at §§ 1.13(b)(2)), Ex. 2, Lin Dep. Tr. at 64:20-22). The PLA itself thus contemplates that the OEM market in which Altek sells digital cameras constitutes an "open market."

In fact, there is no support for Altek's position anywhere in the PLA that "open market price" refers to the retail price charged by Altek's customers to end-user consumers. The PLA never refers to the retail market, retail sales made by an Altek customer, or the price that a third party customer or distributor charges when re-selling a digital camera. And there is nothing in the agreement that suggests that a third party's pricing determination—over which neither Kodak nor Altek have any control—should determine whether Altek must pay royalties. To the contrary, as set forth above, the PLA consistently makes clear that royalties are determined based on the price that ***Altek*** receives. (*See* Ex. 1, PLA at §§ 1.13, 4.4, 4.10.)[6]

***Second***, Altek's interpretation would result in the term "open market price" having two different meanings in the same contract. Under Altek's interpretation, "open market price" would refer to *Altek's* commercial price in Section 1.13 but a *third party's retail price* in Section 4.14. This would violate the established rule of contract interpretation that, absent an express provision to the contrary, a term should be construed to have the same meaning each time it is

---

6 Altek concedes that it has ***never*** paid royalties to Kodak based on the retail price of its digital cameras. (*Id.* at 196:13-15 ("Q. Altek doesn't pay royalties based on revenues received from retail sales, correct? A. Correct.").)

**REDACTED**

used throughout an agreement. *See Reefer & Gen. Shipping Co., Inc. v. Great White Fleet, Ltd.*, 922 F. Supp. 935, 940 (S.D.N.Y. 1996) *aff'd,* 107 F.3d 4 (2d Cir. 1997) ("Absent express provision to the contrary, contractual terms should be construed uniformly throughout the agreement.").

***Third***, Altek's interpretation would eviscerate the purpose of the PLA. Altek asserts that under its interpretation of "open market price," nearly all of its digital camera sales are "contract assembly sales" under Section 4.14. In the second quarter of 2011, for example, Altek made more than [REDACTED] in sales of digital cameras to its OEM customers. But Altek claimed that ***every single sale*** could be excluded and did not pay a single dollar of royalties to Kodak. (Ex. 6, Altek Q2 2011 Royalty Statement.) If this were the correct reading of the PLA, the royalty provisions of the PLA would be essentially meaningless and there would have been no reason for the parties to enter the PLA to begin with. This cannot be the proper interpretation of the agreement. *See Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 624 (S.D.N.Y. 2010) ("Under New York (and every other state's) law, parties are not free to interpret a contract in a way that frustrates the purpose of that contract or that makes any provision of the contract meaningless.").

***Finally,*** Altek cannot rely on extrinsic evidence to alter the plain meaning of the PLA. Unable to identify a single provision of the PLA that supports its proposed interpretation of "open market price" as the "retail price," Altek argues that a series of emails between Kodak and KPMG, a third-party auditor that conducted an audit of Altek's royalty payments in 2010, supports its contract interpretation. Specifically, Altek claims that these emails, in which KPMG discussed with Kodak and Altek the possibility of obtaining "third-party average sales price[ ]"

**REDACTED**

data to determine if Altek improperly excluded sales under Section 4.14, establish that "open market price" means retail price.

As an initial matter, the KPMG emails are extrinsic evidence. The emails were created nearly six years ***after*** Altek signed the PLA. As a matter of law, extrinsic evidence is not relevant where, as here, the terms of the agreement are clear. (Ex. 2, Lin Dep. Tr. at 187:19-22 (the term "open market price" is "very clear")); *see Waldman ex rel. Elliott Waldman Pension Trust v. Riedinger*, 423 F.3d 145, 149 (2d Cir. 2005) ("[I]f a contract is unambiguous on its face, the parties' rights under such a contract should be determined solely by the terms expressed in the instrument itself rather than from extrinsic evidence . . . .").

Even if the KPMG emails were relevant, however, KPMG's discussion regarding third party sales information does not mean that "open market price" refers to "retail price."

Accordingly (and consistent with Section 1.13's use of "Altek's open market price" as a proxy for the price that Altek receives from its sales on the OEM market), Kodak and KPMG discussed obtaining sales data about other OEMs to establish a reference point for Altek's typical sales price. (Ex. 8, Transcript of Kodak 30(b)(6) Deposition at 249:7-251:10 (Kodak and KPMG discussed obtaining third party OEM data to determine a typical OEM sales price).)

**REDACTED**

In other words, even the KPMG emails show that "open market price" refers to the Altek's price on the OEM market—not the "retail price."[7]

### C. Altek Cannot Escape Its Obligations Under the PLA By Arguing For The First Time After Eight Years That The PLA Is Invalid.

Unable to find any support for its interpretation of "open market price" in the PLA, Altek attempts to wholly avoid its royalty payment obligations by asserting that the agreement is invalid. This frivolous argument fails as a matter of law.

To begin, Altek's invalidity argument is directly contrary to the terms of the PLA. Altek cites Section 9.1 of the PLA and claims that the agreement is invalid because it was not approved by its Board of Directors. But Section 9.1 merely states that Altek must obtain any required Board of Director Approval no later than June 30, 2004:

> This Agreement is made subject only to the approval of Altek's Board of Directors in accordance with the by-laws of the corporation. Such Board approval shall not be unreasonably withheld, ***nor shall it be delayed beyond June 30, 2004 local time***.

(Ex. 1, PLA at § 9.1 (emphasis added).) The PLA was executed as of July 1, 2004—the day ***after*** the deadline for Altek to obtain any necessary Board approval. (*Id*. at § 1.5 (effective date of the PLA is July 1, 2004); *id*. at 20 ("[T]he parties have caused their respective corporate names to be affixed hereto and this instrument to be signed by their duly authorized officers, all as of the day and year first above written.").) When Altek's President signed the PLA effective July 1, 2004, Altek effectively represented to Kodak that it had any necessary Board approval. But even if Altek is correct that its Board never approved the PLA, Altek cannot use its own

---

7 Altek concedes that it can point to no documents from the negotiation of the PLA in which either party took the position that "open market price" refers to the retail price charged by a third party customer. (Ex. 2, Lin Dep. Tr. 80:22-81:3 ("Q. You can't identify a single document over the course of the negotiations of the patent license agreement that uses the phrase 'retail price,' correct? [Objection by Altek Counsel] A. I cannot identify.").)

**REDACTED**

failure to comply with the terms of the PLA to argue that the PLA is now invalid. *See Lomaglio Assocs. Inc. v. LBK Marketing Corp.*, 892 F. Supp. 89, 93 (S.D.N.Y. 1995) ("[A] party may not insist upon performance of a condition precedent [to a contract] when its non-performance has been caused by the party himself.").

Indeed, Altek's only explanation for allegedly failing to obtain Board approval is that it *forgot* to submit the PLA to the Board of Directors. (Ex. 2, Lin Dep. Tr. at 124:14-21 ("Final version for some reason, I don't know, nobody remembered, was not sent in for approval.").) Altek cannot agree to obtain Board approval by a specific date before the PLA goes into effect, and then, eight years later, escape its obligations by claiming that it "forgot" to do so. *See Cauff, Lippman & Co. v. Apogee Finance Group, Inc.* 807 F. Supp. 1007, 1024 (S.D.N.Y. 1992) ("[Defendant] could not escape its obligations under the contract merely by failing to take the steps necessary to obtain … approval of the contract").

Altek's own course of conduct over the eight years since the PLA was executed confirms that even Altek believed the PLA to be valid and enforceable. Altek admits that from the time the PLA was executed until this suit was filed, it ***never*** asserted that the PLA was invalid or told Kodak that its Board of Directors did not approve the agreement. (Ex. 3, Altek Second Supplemental Responses to Kodak's Requests For Admission Nos. 1 and 2; Ex. 2, Lin Dep. Tr. at 125:8-14 ("Q So you -- no one from Altek ever told Kodak that its board had never approved the final version of the patent license agreement, right? [Objection by Altek counsel] A. Yes, because no one in Kodak ever asked that question to Altek.").) To the contrary, as even Altek's own corporate representative conceded, Altek "has been behaving as if there's a contract":

> Q. … But we can both agree that between 2004 and 2011, Altek paid royalties to Kodak under the patent license agreement, correct?
>
> [Objection by Altek Counsel]

**REDACTED**

A. Altek has been behaving as if there's a contract. Based on that document we need to make report and pay.

(Ex. 2, Lin Dep. Tr. at 153:6-13.)

In fact, it is undisputed that:

- Altek has paid royalties to Kodak under the PLA for eight years (albeit in the wrong amount) (*Id.* at 153:6-13);
- Altek submitted to an audit of its royalty payments under the PLA in 2010 (Ex. 7, KPMG Audit Report); (Ex. 1, PLA at § 5.3 (requiring Altek to submit to yearly audits);
- Altek agreed in two separate amendments to the PLA that the terms of the PLA are "in full force and effect":

> This Amendment No. 1 … amends the Agreement having an effective date of July 1, 2004 (the "Agreement") between Eastman Kodak Company ("Kodak") and Altek Corporation ("Altek") … All other terms and conditions of the Agreement shall remain in full force and effect. (Ex. 4, Amendment 1 to the PLA; *see also* Ex. 5, Amendment 2 to the PLA ("All other terms and conditions of the Agreement shall remain in full force and effect.").)

- Altek publicly stated in 2005—years after the PLA was executed and Altek was required to obtain any necessary Board approval—that the PLA is in full effect:

> Altek and Kodak have entered a license agreement for digital cameras. Pursuant to that agreement all licensed products sold by Altek are royalty-bearing to Kodak, with the exception of sales to Kodak itself. (Ex. 10, January 31, 2005 Letter from Altek to Digitimes Publications.)

After treating the PLA as valid for more than eight years, and receiving the benefit of a license to Kodak's patented technology, Altek cannot now avoid its obligations by suddenly asserting that the agreement was not valid in the first place. *See Walter E. Heller & Co., Inc. v. Am. Flyers Airline Corp.*, 459 F.2d 896, 901 (2d Cir. 1972) ("[I]t is hornbook law that a condition precedent in favor of one of the parties may be waived by that party."); *PB Americas Inc. v. Cont'l Cas. Co.*, 690 F. Supp. 2d 242, 250 (S.D.N.Y. 2010) ("[T]he nonoccurrence of a condition, even an express condition precedent, may be waived by words or from an inference from a party's conduct.").

**REDACTED**

## IV. CONCLUSION

Altek could have negotiated to define "open market price" as the retail price charged by its customers. But it did not. Instead, Altek: (i) executed the PLA without a single reference to retail price or the retail market; (ii) agreed in Section 1.13—the very first provision to use the term "open market price"—that "open market price" specifically refers to *Altek*'s price; and (iii) agreed to multiple provisions making clear that the relevant price in the royalty calculation is *Altek*'s price (which is a price that is only charged to Altek's OEM customers). Now, eight years later, Altek cannot erase these provisions and re-write the PLA to exclude virtually all of its digital camera sales from the royalty obligation. Kodak respectfully requests that the Court find that the PLA is valid and that "open market price" as used in Section 4.14 refers to Altek's open market price to its OEM customers.

Dated: February 1, 2013
New York, New York

*/s/ Robert J. Gunther, Jr.*

Robert J. Gunther, Jr.
WILMER CUTLER PICKERING HALE & DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 230-8800
Fax: (212) 230-8888
robert.gunther@wilmerhale.com

Michael J. Summersgill (admitted *pro hac vice*)
Jordan L. Hirsch (admitted *pro hac vice*)
Jonathan W. Woodard (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE & DORR LLP
60 State Street
Boston, Massachusetts 02109
Tel: (617) 526-6000
Fax: (617) 526-5000
michael.summersgill@wilmerhale.com
jordan.hirsch@wilmerhale.com
jonathan.woodard@wilmerhale.com

*Attorneys for Eastman Kodak Company*