UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EASTMAN KODAK COMPANY,<br><br>        Plaintiff,<br><br>        v.<br><br>ALTEK CORPORATION,<br><br>        Defendant. | Civil Action No.  12-cv-0246-DLC |

**DECLARATION OF ALEX HSIA IN SUPPORT OF ALTEK CORPORATION'S OPPOSITION TO EASTMAN KODAK COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, Alex Hsia, declare:

1. I make this declaration in support of Defendant Altek Corporation's Opposition to Eastman Kodak's Motion for Partial Summary Judgment. Except as indicated herein, I have personal knowledge of the facts set forth in this declaration and, if called to testify as a witness, could and would competently thereto.

2. I am Altek's President and have held this position beginning in 1996.

3. Altek is one of many Taiwanese corporations that manufacture digital cameras for third parties. As there are many companies like Altek, Altek faces significant competition. Altek's customers provide Altek with hardware specifications, product feature and function information, and when appropriate, proprietary software and firmware for the manufacture of their cameras. Altek never sells the same camera to more than one customer. If Altek did sell the same camera to more than one customer, it would not sell to one customer at a price less than fifty percent of what it sold the same camera to a different customer.

4. With the exception of "Altek Branded Licensed Products," Altek never sells cameras directly to consumers. Rather, Altek's customers sell the manufactured cameras to consumers using their own brand names either directly or through distribution channels.

5. Kodak became an Altek customer beginning in 2002. Beginning in 2003 Kodak became Altek's major customer.

6. Altek executed a document titled "Agreement" on July 1, 2004. A true and correct copy of the final, executed PLA is attached hereto as **Exhibit 1**, as produced by Plaintiff Eastman Kodak Company ("Kodak") with Bates numbers KOD-ATK00000438-57 and designated Confidential pursuant to the Protective Order.

7.      During the negotiation of the PLA, Altek requested that Kodak include a provision that would protect Altek from paying royalties on digital cameras where Altek's profits were low.  In response, Kodak included a version of Section 4.14 in a draft agreement.  This draft provision exempted Altek from paying royalties on cameras that Altek manufactured on a "contract assembly" basis.  A camera falls under the "Contract Assembly" basis where:

> (1) the NetSales collected or received by Altek . . .is less than fifty-percent (50%) of the open market price . . .
>
> And
>
> (2) substantially the entire value Altek provides to the Digital Camera Net Sales price is due to the service of assembling components.

8.      Altek sought confirmation from Kodak regarding the interpretation of Kodak's draft of Section 4.14's "Contract Assembly" exemption.  Kodak responded that under Section 4.14, "any product which Altek receives 50% or more in value to the market value of the product, is a royalty bearing licensed product and anything less than 50%, is a non-royalty bearing and unlicensed product."  Kodak's response reassured Altek that "open marked price" meant a "retail price."

9.      At no point in time during the parties' negotiation of the PLA, did Kodak, or its representatives or agents, ever communicate to Altek that "open market price" was the price Altek receives through a non-discounted, arm's-length transaction, or any other definition that was not a "retail price" definition.  In fact, Kodak did not convey its interpretation that "open market price" was the price Altek receives though a non-discounted, arm's-length transaction until 2011, after it had finished its audit of Altek.

10.     Indeed, during the parties' negotiation of the PLA, the parties met several times to discuss the PLA and the relationship between the two companies.  For example, the parties held

a meeting in Rochester, New York on October 17, 2003 to discuss the PLA. At no point in time during this meeting did Kodak, its representatives, or its agents, communicate to Altek that the definition of "open market price" was the price Altek receives through a non-discounted, arm's-length transaction. Nor did Kodak ever convey that "open market price was Altek's price to its customers. Kodak never told Altek that "open market price" was not a "retail price."

11.     The parties also met in Taiwan in November, 2011. At no point in time during this meeting did Kodak, its representatives, or its agents, communicate to Altek that the definition of "open market price" was the price Altek receives through a non-discounted, arm's-length transaction. Nor did Kodak ever convey that "open market price" was Altek's price to its customers. Kodak never implied to Altek that "open market price" was not a "retail price."

12.     The parties again met in December, 2003 in Las Vegas, Nevada to discuss the PLA. At no point in time during this meeting did Kodak, its representatives, or its agents, communicate to Altek that the definition of "open market price" was the price Altek receives through a non-discounted, arm's-length transaction. Nor did Kodak ever convey that "open market price" was Altek's price to its customers. Kodak never implied to Altek that "open market price" was not a "retail price."

13.     The parties also engaged in multiple phone conferences where the PLA was discussed. At no point in time during these meetings did Kodak, its representatives, or its agents, communicate to Altek that the definition of "open market price" was the price Altek receives through a non-discounted, arm's-length transaction. Nor did Kodak ever convey that "open market price" was Altek's price to its customers. Kodak never implied to Altek that "open market price" was not a "retail price."

14.     During the parties' negotiations of the PLA, Altek made several attempts to

confirm the meaning of "open market price." At no time during the negotiations did Kodak respond that "open market price" was the price Altek receives through a non-discounted, arm's-length transaction." Attached hereto as **Exhibit 2** is a true and correct copy of a November 13, 2003 communication between Altek and Kodak's agent, ATLC, as produced by Kodak with Bates numbers KOD-ATK00000318. Attached hereto as **Exhibit 3**, is a true and correct copy of a December 12, 2003 communication between Altek and Kodak's agent, ATLC, as produced by Kodak with Bates numbers KOD-ATK00000357-58 and designated Confidential pursuant to the Protective Order.

15. Attached hereto as **Exhibit 4** is a true and correct copy of a November 20, 2003 communication between Kodak's agent, ATLC, and Altek, as produced by Kodak with Bates numbers KOD-ATK00000345.

16. If Kodak had stated to anyone at Altek that Kodak interpreted "open market price" as the price Altek receives through a non-discounted, arm's-length transaction, or that it did not mean a "retail price, it undoubtedly would have been brought to my attention as Section 4.14 was a significant provision for Altek. This never occurred. An interpretation of "open market price" as the price received by Altek in an arm's-length transaction would be contrary to the effect that Altek intended when it requested Section 4.14.

17. I executed the PLA on July 1, 2004 with the understanding that "open market price" meant "retail price." If, at the time I executed the PLA, I had even an inkling that "open market price" was the price Altek receives through a non-discounted, arm's-length transaction, I never would have executed the PLA.

18. It is customary in the digital camera industry for manufacturers to set their prices according to the retail prices of the manufactured cameras. For Altek, like with most other

manufactures, the retail price is factored into or used as a base price in determining how much Altek will charge its customers. Altek then accounts for the costs of materials and its competitors' sales prices in setting its own sales prices. Indeed, many of Altek's customers provide retail price information along with any specifications to Altek for Altek's manufacture of their cameras. Kodak itself provided Altek with retail prices for cameras Altek manufactured for Kodak.

19. Altek has collected or obtained Kodak's "retail price" or projected "retail price" information from the time it began manufacturing cameras for Kodak in 2002. Submitted herewith is the CD-Rom labeled "Exhibits to the Declaration of Alex Hsia in Support of Altek Corporation's Opposition to Eastman Kodak's Motion for Partial Summary Judgment" ("Hsia CD"). Included therein, is **Exhibit 5**, a true and correct copy of a spreadsheet, as produced by Altek to Kodak and designated Confidential—Attorneys' Eyes Only pursuant to the Protective Order. This spreadsheet includes a compilation of retail prices, which Altek gathered in late 2002, that Altek used to set its prices for 2004, as Altek created this spreadsheet in the ordinary course of business. Tab "2004" of Exhibit 5 identifies Altek's pricing information, including its margins and prices to its customers. Cell "L22" indicates a "street price" for the cameras Altek manufactures. "Street price" means a "retail price." Cell "L22" states that "street price" is twice the "FOB" price. "FOB" stands for "freight on board" and represents Altek's prices to its customers. Thus, this document makes clear that Altek intended to set its prices at half the retail prices.

20. Included on the HSIA CD is **Exhibit 6**, a true and correct copy of a spreadsheet reflecting a 2004 quotation to Kodak, produced by Altek to Kodak and designated Confidential—Attorneys' Eyes Only pursuant to the Protective Order. This document was

created in the ordinary course of business. "Beef" is Altek's reference for Kodak. When comparing the "Pricing" in Row 8 of this spreadsheet with Tab "2004" in Hsia Decl., Exhibit 5, it is evident that the quoted prices in Exhibit 6 for the various cameras models, are slightly more than fifty percent of the proposed retail prices found in Hsia Decl., Exhibit 5, Tab 4. For example, comparing Altek's quoted price for Model 3M3X in cell "8E" of Hsia Decl., Exhibit 6 to the same model number in cell "22H" located at Tab "2004" in Hsia Decl., Exhibit 6, it is evident that Altek's quoted price is slightly more than fifty percent of the proposed retail price. Thus, Exhibit 6 indicates that Altek's prices fell around, and sometimes above, fifty percent of the "retail price" for various cameras. If these cameras were manufactured for a customer other than Kodak, then, Altek would pay royalties for such camera sales.

21.     During the parties' negotiations, Altek communicated to Kodak that it could not enter into any agreements without the approval of its Board of Directors. To address Altek's concerns, Kodak drafted and included provisions in the PLA stating that the PLA was subject to approval by Altek's Board of Directors. I never presented the PLA for the Board's approval pursuant to Altek's bylaws and the Taiwanese Companies Act. Altek's bylaws require that Altek be governed by the Taiwanese Companies Act. The Taiwanese Companies Act has specific requirements that must be met for board approval. These requirements were not met. To date, Altek's Board has not approved the PLA.

22.     On August 26, 2011, Kodak sent Altek a letter in which it conveyed to Altek that "open market price" was the "price that Altek receives through a non-discounted, *arms-length* [sic] transaction." A true and correct copy of this letter is attached hereto as **Exhibit 7,** as produced by Kodak with Bates numbers KOD-ATK0001262-63.

23.     Attached hereto as **Exhibit 8** is a true and correct copy of Altek's bylaws that

were in effect in 2004, as produced by Altek with Bates numbers ATLK00001857-1866.

24. To the best of my knowledge, Kodak did not ask whether Altek's Board had approved the PLA prior to, or even after, executing the PLA.

25. Attached hereto as **Exhibit 9** is a true and correct copy of Altek's January 31, 2005 Royalty Statement to Kodak for royalties accrued in the fourth quarter of 2004, as produced by Kodak with Bates numbers KOD-ATK00000478-79 and designated Confidential pursuant to the Protective Order.

26. Attached hereto as **Exhibit 10** is a true and correct copy of Altek's October 15, 2008 Royalty Statement to Kodak for royalties accrued in the third quarter of 2008, as produced by Kodak with Bates numbers KOD-ATK00002874 and designated Confidential pursuant to the Protective Order.

27. Attached hereto as **Exhibit 11** is a true and correct copy of Altek's Royalty Statement to Kodak for royalties accrued in the first quarter of 2011, as produced by Kodak with Bates numbers KOD-ATK00001365 and designated Confidential pursuant to the Protective Order.

28. To date, Altek has paid approximately $2,500,000 in royalties to Kodak.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Taiwan this 15th day of February, 2013.

By: _____
ALEX HSIA