UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :    12 Civ. 0246 (DLC)
EASTMAN KODAK COMPANY,                   :
                        Plaintiff,       :
                                        :
            -v-                          :    OPINION & ORDER
                                        :
ALTEK CORPORATION,                       :
                                        :
                        Defendant.       :
                                        :
----------------------------------------X

Plaintiff:

Robert J. Gunther, Jr.
Wilmer Cutler Pickering Hale & Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007

Michael J. Summersgill
Jordan L. Hirsch
Jonathan W. Woodard
Wilmer Cutler Pickering Hale & Dorr LLP
60 State Street
Boston, Massachusetts 02109

Defendant:

Michael Heafey
Morvarid Metanat
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, California 94025

Lisa Simpson
Orrick, Herrington & Sutcliffe LLP
51 W. 52nd Street
New York, New York 10019

DENISE COTE, District Judge:

Plaintiff Eastman Kodak Company ("Kodak") brings this action to recover royalties it claims are owed pursuant to a patent licensing agreement with defendant Altek Corporation ("Altek").  On February 1, 2013, both parties moved for partial summary judgment on the issue of interpretation of the term "open market price" in the licensing agreement.  In addition, Kodak moved for summary judgment on the issue of the validity of the licensing agreement.  For the following reasons, the plaintiff's motion is granted and the defendant's motion is denied.


BACKGROUND

The following facts are undisputed unless otherwise noted. Kodak is a picture and printing company that owns and licenses an extensive portfolio of digital camera patents.  Altek is a Taiwanese company that manufactures digital cameras.  Kodak and Altek entered into a patent license agreement in July 2004 ("PLA").  The PLA was signed by Altek's President Alex Hsia ("Hsia") on July 1 and Kodak's Senior Vice President Willy Shih ("Shih") on July 14.

Under the PLA, Altek is granted a "non-exclusive, non-transferable license" to use Kodak's entire digital camera patent portfolio.  The PLA permits Altek to use Kodak's patents

in order to make and sell two types of digital cameras. Specifically, the PLA describes the sale of digital cameras branded with Altek's own tradename ("Altek Branded Licensed Products"), and digital cameras that Altek sells as an Original Equipment Manufacturer to commercial customers and which bear the tradename of the customer ("OEM Licensed Products").

Altek does not presently sell Altek Branded Licensed Products and it does not sell digital cameras directly to the retail market.[1]  Instead, Altek operates principally by manufacturing cameras for third parties in accordance with the third parties' specifications.  The third parties then distribute the digital cameras to consumers either directly or through distribution channels.  For the purposes of this Opinion, the Court will refer to the market in which Altek directly sells its products as the "wholesale market."

Altek's royalty payments to Kodak are calculated on the basis of Altek's "Net Sales" of its OEM Licensed Products and Altek Branded Licensed Products.  Section 1.13(b) defines Altek's Net Sales of OEM Licensed Products in two ways, depending on whether the sale was at arms length or not.

> (1)  In the case of an arms length sale or other
>      disposal of an OEM Licensed Product which is made

---

[1] For a period of less than a year, ending sometime in 2004, Altek sold its own branded camera in China.  Nonetheless, Altek's corporate representative testified that Altek has never sold digital cameras directly to the retail market.

with Altek's components and/or third party components purchased in an arms length sale, <u>Net Sales shall mean the total net revenue</u> received by Altek and its Subsidiaries resulting from the sale or placement of such OEM Licensed Product whether through purchase, lease or other commercial transaction to Altek's or Altek's Subsidiaries' OEM customers, less any Deductions. Components purchased or acquired by Altek or a Subsidiary from an OEM customer for use in manufacturing an OEM Licensed Product for said customer shall be valued for the purpose of royalty determination, at a price equivalent to an arms length transaction purchased from such OEM customer.

(2) <u>In the case of a sale</u> or disposal of an OEM Licensed Product <u>which has not been sold in an arms length transaction, Net Sales shall mean Altek's open market price</u> for such OEM Licensed Product in the country of sale on the date when such sale occurred less any Deducations or, alternatively, if there is no open market price, an imputed price determined on a commercially reasonable basis to be no less than the price of commercially available Digital Cameras in the country of sale which are in respect of features and functions equal or substantially equivalent to Altek's OEM Licensed Product.

(Emphasis supplied.)  In other words, if the sale was not in an

"arms length transaction," then Net Sales is defined as Altek's

"open market price."

The PLA contemplates that Altek will "pay a royalty on all

Digital Cameras sold or transferred by Altek or a [sic] Altek

Subsidiary to a third party" subject to certain exceptions.  One

such exception is the exception for Altek's sales of "Contract

Assembly Digital Camera[s]."  Section 4.14 of the PLA provides

the relevant exception:

This paragraph is intended to exclude from OEM Licensed Products those Digital Cameras that Altek makes or sells on a "contract assembly" basis, as defined below.  For purposes of this Agreement a Digital Camera is a "Contract Assembly Digital Camera" if and only if the Net Sales collected or received by Altek for said Digital Cameras is less than fifty-percent (50%) of the open market price, or if there is no open market price a commercially reasonable price, of Digital Cameras which are in respect of features and functions equal or substantially equivalent to said Digital Camera. . . .

The PLA was expressly made subject to approval of Altek's Board of Directors.  The condition of board approval is referenced twice in the PLA.  The first page of the PLA provides:

WHEREAS, Kodak and Altek each represents that it is fully authorized to deal generally with and to make this Agreement respecting the subject matter hereof, subject only to the approval of Altek's Board of Directors in accordance with the provisions set forth below, and the parties desire to enter into this Agreement on the terms hereinafter set forth.

(Emphasis supplied.)  Subsequently, in Article IX of the PLA, the parties agreed that

[t]his Agreement is made subject only to the approval of Altek's Board of Directors in accordance with the by-laws of the corporation.  Such Board approval shall not be unreasonably withheld, nor shall it be delayed beyond June 30, 2004 local time.

The parties dispute whether formal board approval was ever obtained from Altek's board.  In particular, Altek's corporate representative testified that, for some reason, no one at Altek remembered to send the final version of the PLA to Altek's board

for approval.  Kodak contends that, by signing the PLA after the deadline for obtaining board approval as described in the PLA had passed, Altek impliedly represented that it had necessary board approval.  Kodak relies as well on the undisputed facts that between 2004 and 2011, Altek paid royalties to Kodak; that the PLA was amended twice in 2006; and that Altek submitted to an audit of its royalty payments in 2010.

On January 12, 2012, Kodak filed its complaint against Altek asserting causes of action for breach of contract and declaratory judgment of Altek's obligations under the PLA.  On June 25, the Court endorsed the parties' proposed schedule for targeted fact discovery.  Under this scheduled, the parties were permitted to take discovery relating to the validity of the PLA, the proper interpretation of "open market price" as that term is used in the "Contract Assembly" exception of Section 4.14 of the PLA, and the negotiation of section 4.14 and other sections of the PLA, among other issues.  The parties served their cross-motions for partial summary judgment on February 1, 2013.  These motions were fully submitted on February 26.  Redacted versions of the parties' motion papers were filed on the Electronic Case Filing system in February.

DISCUSSION

A motion for summary judgment may be granted only if the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In deciding whether a party is entitled to summary judgment the Court "must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000). When, as here, the parties present cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Heublein Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993). The substantive law governing the case will identify those issues that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1987). Thus, in order to decide whether to grant summary judgment, this Court must determine (1) whether a genuine factual dispute exists based on the admissible evidence in the record, and (2) whether the facts in dispute are material based on the substantive law at issue.

I. Choice of Law

In a case grounded in diversity jurisdiction, a federal court "must apply the choice of law analysis of the forum state." GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc., 449 F.3d 377, 382 (2d Cir. 2006). New York courts will honor a choice of law clause found in the parties' contract unless "the most significant contacts with the matter in dispute are in another state." Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel, 346 F.3d 360, 365 (2d Cir. 2003). Furthermore, where the parties' briefs assume New York law controls, this constitutes their implied consent to the application of New York law and is "sufficient to establish choice of law." Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d. Cir. 2000).

There are a number of reasons that New York law properly governs this action. Kodak's principal place of business is in New York State. Furthermore, pursuant to the PLA's choice of law provision, disputes arising out of or pertaining to the PLA are governed by "the substantive laws of New York State." In addition, although neither party expressly addresses the appropriate choice of law, both have applied New York State law. Accordingly, the issues of interpretation and validity of the PLA are governed by the substantive laws of New York State.

II. Validity of the PLA

Despite paying royalties and submitting to an audit, Altek contends that the PLA is invalid.  In a suit for breach of contract, the plaintiff "must demonstrate the existence of a contract reflecting the terms and conditions of [the parties'] purported agreement." Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 181-82 (2011)(citation omitted).  In order for an enforceable contract to exist, "there must be an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound." Civil Serv. Emps. Ass'n, Inc. v. Baldwin Union Free School Dist., 924 N.Y.S.2d 126, 128 (2d Dep't 2011)(citation omitted).  It has long been established that by entering into contracts, an authorized agent can bind its principal.  See, e.g., Hydock v. Stow, 40 N.Y. 363, 368 (1869); Worrall v. Munn, 5 N.Y. 229, 238 (1851).  When corporations enter into contracts, they "of necessity" do so through the acts and representations of an agent.  See Kirschner v. KPMG LLP, 15 N.Y.3d 446, 464 (2010)(citation omitted).  Under New York law, the president of a corporation is presumed to have the power to enter into contracts that are "usual in the business." Schwartz v. United Merchs. & Mfrs., 72 F.2d 256, 258 (2d Cir. 1934); see also Scientific Holding Co., Ltd. v. Plessey Inc., 510 F.2d 15, 24 (2d Cir. 1974)(confirming ordinary business rule).

In general, the obligations of a contract do not become binding on the parties until any conditions precedent described in the agreement have occurred.

> A condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.

Argo Corp. v. Greater New York Mut. Ins. Co., 4 N.Y.3d 332, 337 n.2 (2005)(citation omitted).  Use of the linguistic convention "subject to" has been held to create a condition precedent. Ginett v. Computer Task Group, Inc., 962 F.2d 1085, 1100 (2d Cir. 1992); see also Israel v. Chabra, 537 F.3d 86, 93 (2d Cir. 2008).

Ordinarily, if the failure of a condition precedent is raised by a party, the party claiming breach of contract has the burden of proving the condition was satisfied.  See Rachmani Corp. v. 9 East 96th St. Apartment Corp., 629 N.Y.S.2d 382, 386 (1st Dep't 1995).  This general principle, however, is subject to the "well-settled and salutary rule that a party cannot insist upon a condition precedent, when its non-performance has been caused by himself."  A.H.A. Gen. Const., Inc. v. NYC Hous. Auth., 92 N.Y.2d 20, 31 (1998)(citation omitted); cf. Holland v. Ryan, 762 N.Y.S.2d 740, 742 (4th Dep't 2003) (defendants not entitled to rely on nonoccurrence of condition that plaintiff

sign agreement before certain date, where they failed to submit the agreement to plaintiff for his signature before that date).

Altek argues that the PLA is not a valid contract since its board never approved the PLA.  Kodak characterizes the alleged failure of Altek to obtain board approval as the nonoccurrence of a condition precedent.  Accordingly, it invokes the principle that a party cannot raise the nonoccurrence of a condition precedent as a defense to a contract's enforcement when the same party caused the nonoccurrence.

It is undisputed that the president of Altek executed the PLA and its subsequent amendments.  Under New York law, a corporation's president is presumed to have authority to enter into transactions that are "in the ordinary course of corporate business."  See, e.g., Atai v. Dogwood Realty of N.Y., Inc., 807 N.Y.S.2d 615, 618-19 (2d Dep't 2005).  No argument has been made by Altek that the PLA falls outside the range of contracts into which digital camera manufacturers ordinarily enter.  Altek does argue, however, that Kodak was not entitled to rely on Hsia's apparent authority because the inclusion of the board approval provision in the PLA put Kodak on notice that Hsia's authority was limited.  This argument ignores the fact that Hsia executed the PLA after the deadline for obtaining board approval had passed.  Under the circumstances, Kodak was entitled to rely on Hsia's apparent authority to enter into the PLA.  Thus, as a

matter of agency law and general corporations law, Altek is
bound by its president's agreement to execute the PLA.

In addition, Altek is not entitled to raise the
nonoccurrence of this condition precedent as a defense to
Kodak's breach of contract claim.  The duty of good faith,
implicit in every contract, applies as well to conditions
precedent to contracts.  Cf. Westerbeke Corp. v. Daihatsu Motor
Co., Ltd., 304 F.3d 200, 212 (2d Cir. 2002)(collecting cases).
Thus, a party must not intentionally act to frustrate or prevent
the occurrence of a condition precedent.  See e.g., Fairway
Prime Estate Mgm't, LLC v. First Am. Intern. Bank, 952 N.Y.S.2d
524, 527 (1st Dep't 2012); Eastern Consol Prop., Inc. v.
Adelaide Realty Corp., 691 N.Y.S.2d 45, 48-49 (1999).  Where
"the occurrence of the condition is largely or . . . exclusively
within the control of one of the parties . . . the express
language of the condition gives rise to the implied language of
promise."  Rachmani Corp., 629 N.Y.S.2d at 387(citation
omitted).  Thus, in appropriate circumstances, a party's failure
"to make a good-faith effort" to bring about the occurrence of a
condition precedent will preclude the party from taking
advantage of the nonoccurrence.  Id.; see also In re Bankers
Trust Co., 450 F.3d 121, 128-29 (2d Cir. 2006).

In this case, Altek had an obligation to make a good-faith
effort to bring about the condition precedent.  Board approval

12

of the PLA was exclusively within its control.  Furthermore, the
PLA expressly provides that "Board approval shall not be
unreasonably withheld, nor shall it be delayed beyond June 30,
2004 local time."  Altek has presented no evidence that it made
a reasonable and good faith effort to obtain board approval.
Instead, there is evidence that Altek merely forgot to send the
final version of the PLA to the board of directors for approval.
It is noteworthy as well that, although board approval was
allegedly not obtained by June 30, 2004, Altek's president
executed the PLA on July 1, 2004.  Because the occurrence of the
condition precedent was solely within Altek's control, Altek may
not raise the nonoccurrence as a defense to Kodak's breach of
contract claim.

Altek argues that the requirement of board approval was
not, or was not merely, a condition precedent to the existence
of the parties' agreement.  Rather, Altek contends, board
approval was an indispensable precondition of Altek's authority
to enter into the PLA.  For this proposition it cites a
provision of Altek's by-laws, and five articles of the Taiwanese
Company Act.  For at least three reasons, these contentions also
fail to raise a genuine issue of material fact.

First, to the extent that Altek seeks to apply foreign law
to the question of the authority of Altek's president to execute
the PLA, the evidence offered by Altek falls short of

demonstrating that Taiwanese law would not recognize the
signature of the corporation's president as binding on the
corporation.[2]  The potential relevance of Taiwanese law stems
from a number of circumstances.  First, Altek is a Taiwanese
company; its by-laws expressly provide that it is "incorporated
in accordance with the provisions of the [Taiwanese] Company Act
for limited liability companies."  Second, the PLA states that
it is "made subject only to the approval of Altek's Board of
Directors in accordance with the by-laws of the corporation."

Altek directs attention to five provisions of the Taiwanese
Company Act.  These provisions describe the procedures of
calling and holding a meeting of the board directors, adopting
resolutions, and taking minutes.  Nothing in these provisions
indicates that under Taiwanese law a president of a corporation
is without authority to enter into a contract in the absence of
board approval.  Although Federal Rule of Civil Procedure 44.1
permits a Court to conduct its own research into foreign law, it
has no obligation to do so, particularly "in the absence of any

---

[2] Under Federal Rule of Civil Procedure 44.1 "a party who intends
to raise an issue about a foreign country's law must give notice
by a pleading or other writing.  In determining foreign law, the
court may consider any relevant material or source, including
testimony, whether or not submitted by a party or admissible
under the Federal Rules of Evidence.  The court's determination
must be treated as a ruling on a question of law."  Fed.R.Civ.P.
44.1.

suggestion that such a course will be fruitful."  <u>Bartsch v. Metro-Goldwyn-Mayer, Inc.</u>, 391 F.2d 150, 155 n.3 (2d Cir. 1968).

Second, it is not clear that New York courts would apply Taiwanese law to the question of an agent's authority to enter into a contract where the contract itself contains a New York choice of law provision.  For instance, in <u>IRB-Brazil-Resseguros, S.A. v. Inepar Investments, S.A.</u>, 922 N.Y.S.2d 308, 311 (1st Dept. 2011), the court applied New York's law to determine whether the officers of a Brazilian corporation had authority to execute a guarantee that contained a New York choice of law provision.

Third, Altek has not actually argued that Taiwanese law differs from the law of New York on the question of authority of a corporate officer to bind a corporation.  Although Altek refers to provisions of the Taiwanese Company Act, it cites only New York case law on the authority of agents to enter into contracts.  The New York cases cited by Altek, incidentally, fail to support its contention that Altek's president lacked authority to enter the PLA in the absence of board approval.  In <u>Carner v. Bd. of Educ. Of City of New York</u>, 622 N.Y.S.2d 38, 38 (N.Y. App. Div. 1995), the court applied a rule found in New York's General Obligations law that an agent must have written authority to enter contracts that themselves must be in writing pursuant to the Statute of Frauds.  <u>Id.</u> at 381; <u>see also</u> General

Obligations Law § 5-702(2).  This rule does not even apply,
however, to officers and directors of corporations due to the
fact "that corporations can only act through individuals."
Commission on Ecumenical Mission & Relations v. Roger Gra, Ltd.,
27 N.Y.2d 457, 462 (1971).  In Parsa v. State, 64 N.Y.2d 143,
147 (1984), the court addressed the authority of the State of
New York to challenge contracts that purport to bind it.  Id.
Neither of these cases suggests that an officer of a private
corporation is unauthorized to execute an agreement binding the
corporation.

II. Interpretation of the term "Open Market Price"

     Having determined that the PLA is a valid contract, the
next issue to be addressed is the meaning of the term "open
market price."  When a court interprets contract language, its
"primary objective is to give effect to the intent of the
parties as revealed by the language they chose to use." Seiden
Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir.
1992).  In cases where the parties' dispute rests on the
interpretation of a contract term, it is the court's role to
determine whether, as a matter of law, the term is ambiguous.
Law Debenture Trust Co. v. Maverick Rube Corp., 595 F.3d 458,
465 (2d Cir. 2010).  A contract term is unambiguous where it
conveys "a definite and precise meaning, unattended by danger of
misconception in the purport of the contract itself, and

concerning which there is no reasonable basis for a difference of opinion." Hugo Boss Fashions, Inc. v. Fed. Ins. Co., 252 F.3d 608, 617 (2d Cir. 2001)(citation omitted).  A term is ambiguous, on the other hand, when it is

> capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business.

Id. Ambiguity does not arise merely by virtue of the fact that the parties volunteer different definitions.  Law Debenture Trust Co., 595 F.3d at 467.  For instance, the proposal of an interpretation that "strains the contract language beyond its reasonable and ordinary meaning" does not create ambiguity where none otherwise exists.  Seiden Assocs., Inc., 959 F.2d at 428 (citation omitted).  Where contract language is unambiguous, extrinsic evidence of the parties' subjective intent may not be considered.  Law Debenture Trust Co., 595 F.3d at 466.

When considering the meaning of a contract term in the larger context of an entire agreement, a Court "may presume that the same words used in different parts of a writing have the same meaning." Finest Investments v. Sec. Trust Co. of Rochester, 468 N.Y.S.2d 256, 258 (4th Dep't 1983).  Similarly, the use of the definite article "the" to modify a noun tends, in appropriate circumstances, to refer back to a previous

appearance of the noun.  Id.; cf. National Foods, Inc. v. Rubin, 936 F.2d 656, 660 (2d Cir. 1991).

The parties' dispute is focused on the interpretation of the term "open market price" as it appears in Section 4.14 of the PLA.  As described above, Altek is not required to pay royalties on sales of digital cameras that are made on a "contract assembly" basis

> if and only if the Net Sales collected or received by Altek for said Digital Cameras is less than fifty-percent (50%) of the open market price . . . of Digital Cameras which are in respect of features and functions equal or substantially equivalent to said Digital Camera.

(Emphasis supplied.)  The term "open market price" is undefined in the PLA.  Kodak contends that "open market price" refers to the price that Altek charges on the open market to its commercial customers, or in other words, the wholesale market price.  Altek, on the other hand, defines "open market price" as the price of its digital cameras on the retail market.

An open market refers to "an unrestricted market in which any buyer or seller may trade freely, and where prices are determined by supply and demand." Oxford English Dictionary (3d ed. 2004).[3]  Both retail and wholesale markets can be fairly described as open markets.  In isolation, the term "open market

---

[3] Black's Law Dictionary defines open market as "a market in which any buyer or seller may trade and in which prices and product availability are determined by free competition." Black's Law Dictionary (9th ed. 2009).

price" could reasonably be interpreted to refer to the price received for a product in either market.  When read in the context of the PLA as a whole, however, the term unambiguously refers to the price Altek receives for digital cameras in the wholesale market.

In addition to Section 4.14, the term "open market price" appears in earlier sections of the PLA.  Relevant to the case at hand, the term open market price is used in Section 1.13(b), which defines the meaning of "Net Sales" in the context of sales of OEM Licensed Products.[4]  This subsection first defines Net Sales in arms length transactions, and next in transactions that are not at arms length.  For ease of reference, portions of these provisions are quoted again here.

> (1)  In the case of an arms length sale . . . of an
>       OEM Licensed Product which is made with Altek's
>       components and/or third party components . . .,
>       Net Sales shall mean the <u>total net revenue
>       received by Altek</u> . . . from the sale . . . of
>       such OEM Licensed Product . . . to Altek's . . .
>       OEM customers, less any Deductions. . . .

---

[4] The term "open market price" also appears in Section 1.13(a)(3) which defines Net Sales when Altek sells an Altek Branded Licensed Product in a non-arms length sale.  In the case of such a sale, Altek's Net Sales are defined as "Altek's open market price to a non-affiliated third party for such Altek Branded Licensed Product on the date when such sale occurred. . . ." This section is less relevant than Section 1.13(b) because it is undisputed that Section 4.14 represents an exclusion for OEM Licensed Products, not Altek Branded Licensed Products.  In any case, the use the term Altek's open market price in Section 1.13(a) is not inconsistent with the Court's interpretation of open market price in either Section 1.13(b) or Section 4.14.

> (2)  In the case of a sale . . . of an OEM Licensed
>      Product which has not been sold in an arms length
>      transaction, Net Sales shall mean <u>Altek's open
>      market price</u> for such OEM Licensed Product in the
>      country of sale on the date when such sale
>      occurred less any Deductions. . . .

(Emphasis supplied.)

The language of Section 1.13 offers persuasive evidence of the meaning of "open market price" as the price in the wholesale market in two ways.  First, the reference to "Altek's open market price" is naturally read to refer to the price existing in the open market in which Altek itself sells its digital cameras, that is, the wholesale market.  It is undisputed that Altek does not sell digital cameras on the retail market, but instead sells to distributors who in turn sell the cameras on the retail market.  Thus logically, the term "Altek's open market price" refers to the price Altek receives in the wholesale market when it sells its digital cameras to commercial customers.

Second, the structure of Section 1.13(b) suggests that subsections 1.13(b)(1) and (2) are parallel provisions.  Subsection 1.13(b)(1) defines Net Sales in the context of an arms length transactions, as "the total net revenue received by Altek."  The following subsection, in which Net Sales is defined in the context of a non-arms length transaction, is naturally read as adopting a proxy for total net revenue in cases where

20

the total net revenue has not been tested by the forces of competition.  Thus, Section 1.13(b)(2)'s use of the term "Altek's open market price" is sensibly read as referring to a price that will provide a reasonable proxy for Altek's total net revenue.  It is undisputed that prices for digital cameras in the wholesale market are a better proxy for Altek's total net revenues than are retail prices.

Having concluded that Section 1.13(b)'s reference to open market price signifies the price of Altek's digital cameras in the wholesale market, it is necessary to determine whether Section 4.14 employs a different definition of open market price.  Nothing in the PLA indicates that Section 4.14 is meant to adopt a different definition of open market price than the meaning evinced in Section 1.13(b).  The use of the definite article "the" in modification of "open market price" is thus reasonably read as referring back to the term "Altek's open market price" in Section 1.13(b).  Accordingly, it is appropriate to assign the same definition -- Altek's wholesale market price -- to both terms.

In its own motion for summary judgment, Altek argues that the plain meaning of "open market price" unambiguously refers to retail price.  It reaches this conclusion by defining an "open market" as a market that is available to the public at large and not merely to distributors.  Altek cites no authority for this

narrow definition of open market.  Based on its definition of
open market, Altek proceeds to argue that because "retail" is
defined as "the sale to the <u>public</u> of goods," an open market
price can only refer to retail price.  Altek's argument suffers
from its application of an unduly narrow definition of open
market.  As described above, the term open market refers to "an
unrestricted market in which any buyer or seller may trade
freely, and where prices are determined by supply and demand."
<u>Oxford English Dictionary</u> (3d ed. 2004).  While the retail
market can be described as an open market, it is not the only
open market.

Altek also makes a related argument that "open market
price" cannot refer to its price in the wholesale market because
"such a market does not exist."  Altek reasons that because
Altek never sells the same camera to more than one customer,
there "is no relevant market for Altek's camera sales."  This
contention fails for at least two reasons.  Although Altek never
sells the same camera twice, it is undisputed that Altek
functions in a market that is highly competitive.  As Altek's
president has explained

> Altek is one of many Taiwanese corporations that
> manufacture digital cameras for third parties.  As
> there are many companies like Altek, Altek faces
> significant competition.

Second, the fact that "Altek's open market price for [an] OEM Licensed Product" may be difficult to ascertain because Altek never sells the same camera twice is already addressed in the PLA and therefore not inconsistent with its terms.  Section 1.13(b)(2) contemplates the possibility that there may be no open market price.  It provides that "if there is no open market price, [Net Sales is defined as] an imputed price determined on a commercially reasonable basis."

Altek makes one additional textual argument in its opposition to Kodak's motion for summary judgment.  In particular, Altek argues that "open market price" cannot refer to the price charged in an arms length transaction with a commercial customer because that definition creates contradictions among the provisions of the PLA and renders Section 4.14 ineffective.  Altek's argument begins with the language of Section 4.14.  As described above, Section 4.14 exempts sales of Contract Assembly Digital Cameras from Altek's royalty obligations "if and only if the <u>Net Sales</u> collected or received by Altek for said Digital Cameras is <u>less than fifty-percent</u> (50%) of the <u>open market price</u>."  Altek then argues that if a digital camera is sold at less than 50% of the price that Altek would otherwise receive in an arms length transaction with a commercial customer, that sale <u>must</u> be a non-arms length sale.  Accordingly, Altek contends, it is necessary to apply the

definition of "Net Sales" that appears in Section 1.13(b)(2), which defines "Net Sales" in the context of a non-arms length transaction.  As described above, Section 1.13(b)(2) defines "Net Sales" as "Altek's open market price."  Thus, completing the chain of reasoning, in any case in which Altek sold a digital camera at less than 50% of the open market price, Altek's Net Sales would be defined for royalty purposes at its full open market price and, as a result, Section 4.14 would never apply.

Altek's argument fails to demonstrate that retail price must be employed as the meaning of open market price in order to avoid the paradox it describes.  Altek assumes that all sales of digital cameras made below 50% of the price Altek ordinarily receives in an arms length transaction with a commercial customer are of necessity non-arms length transactions.  That assumption is unfounded.  The fact that an open market price is the price in an arms length transaction does not mean that any transaction in which the price received is below the open market price is not an arms length transaction.  Indeed, it is entirely possible that Altek would be able to sell a digital camera "on a 'contract assembly' basis" in an arms length transaction for less than 50% of the price at which it sells similar cameras that are produced on some other basis.  As Kodak points out, Altek may be able to perform "contract assembly" by simply

assembling parts that are supplied by a customer.  In such cases, Altek's costs in creating the digital camera would be lower than they would be if Altek had manufactured the camera. With lower costs, Altek could sell such "Contract Assembly Digital Cameras" at a price that is less than 50% of the open market price for similar digital cameras.

Altek responds, however, that even this type of transaction would not qualify for the exemption described in Section 4.14. To make this point Altek once again refers to Section 1.13(b). Section 1.13(b)(1) provides that

> In the case of an arms length sale or other disposal of an OEM Licensed Product which is made with Altek's components and/or third party components purchased in an arms length sale, Net Sales shall mean the total net revenue received by Altek and its subsidiaries resulting from the sale or placement of such OEM Licensed Product. . . .
>
> Components purchased or acquired by Altek or a Subsidiary from an OEM customer for use in manufacturing an OEM Licensed Product for said customer shall be valued for the purpose of royalty determination, at a price equivalent to an arms length transaction purchased from such OEM customer.

(Emphasis supplied.)  Altek argues that the final sentence of Section 1.13(b)(1) expressly contemplates a situation in which Altek is hired merely to assemble parts provided to it by a customer.  Under Altek's reading of this language, whenever Altek receives components from a customer, Altek's "Net Sales"

for purposes of a royalty calculation are increased "by a price equivalent to an arms length transaction" for the parts.

Altek's argument fails, however, because it ignores the fact that the final sentence of Section 1.13(b)(1) and Section 4.14 are describing two different types of services that Altek could provide to customers.  Section 1.13(b)(1) addresses the situation in which Altek has purchased or acquired components "for use in manufacturing" an OEM Licensed Product.  Section 4.14, on the other hand, applies to circumstances in which Altek makes or sells a digital camera on a "contract assembly" basis. The terms manufacturing and assembly have related but distinct meanings.  Cf. Tide-Water Oil Co. v. United States, 171 U.S. 210, 217 (1898).  Manufacturing refers to "the process of making wares by hand or by machinery especially when carried on systematically with division of labor." Merriam-Webster Dictionary (2013).  Assembly, on the other hand, refers to "the fitting together of manufactured parts into a complete machine, structure, or unit of a machine." Merriam-Webster Dictionary (2013).

The PLA distinguishes between parts supplied for the purposes of assembling a product, and parts supplied for use in manufacturing a product.  Even if the distinctions between manufacturing and assembly are not immediately evident to the layperson, traditional principles of construction would counsel

against equating the two terms.  The use of similar but
different terms in a single contract "strongly implies that the
terms are to be accorded different meanings."  <u>NFL Enters. LLC</u>
<u>v. Comcast Cable Commc'ns, LLC</u>, 851 N.Y.S.2d 551, 557 (1st Dep't
2008).  In light of the fact that Section 1.13(b)(1)'s final
sentence expressly applies to components bought for "use in
manufacturing," there is no basis to find that the sentence has
any impact on the calculation of Net Sales when digital cameras
are sold on a contract assembly basis.

Finally, Altek has offered four categories of extrinsic
evidence to support its interpretation of "open market price" as
retail price.  These categories include: (1) evidence of the
parties' negotiations over the drafting of the PLA; (2) evidence
that Altek and companies like Altek rely on retail price to set
their own prices; (3) evidence from a 2010 audit of Altek's
royalty payments; and (4) an expert report on Altek's "market
power."  Because the term "open market price" unambiguously
refers to Altek's wholesale market price, it is not appropriate
to consider extrinsic evidence.  But, even if it were proper to
consider Altek's extrinsic evidence, none of the offered
evidence is sufficient to raise a genuine issue of material fact
with respect to the meaning of open market price.

For example, Altek argues that the parties' negotiation
history demonstrates that the parties' understood open market

27

price to refer to retail price.  For this point, Altek points to a chain of emails exchanged between Altek and Kodak in November 2003.  In the first email, Altek requested clarification of the "contract assembly" provision among other provisions.  Kodak responded that it believed that Section 4.14 was "fairly self-explanatory" and it later responded by saying that under Section 4.14

> Any product which Altek receives 50% or more in value to the market value of the product, is a royalty bearing licensed product and anything less than 50%, is a non-royalty bearing and unlicensed product.

This exchange hardly suggests that open market price refers to retail price.  Indeed, this alternative definition still requires a determination of which "market" is referred to by the language "market value."  In conclusion, Kodak has shown through undisputed evidence that it is entitled to judgment as a matter of law on the interpretation of open market price.

III. Altek's Request for Additional Discovery

Altek has submitted an affidavit pursuant to Federal Rule of Civil Procedure 56(d) in which it states that, because Kodak's two 30(b)(6) witnesses were insufficiently prepared, Altek needs a further opportunity to develop evidence from the period prior to the execution of the PLA, specifically (1) whether Altek communicated to Kodak prior to the execution of the PLA either a) Altek's interpretation of the term "open

market price," or b) that its board had not approved the PLA;
and (2) whether Kodak communicated its interpretation of the
term "open market price."  Altek took two 30(b)(6) depositions
in advance of the present motion practice.  Altek deposed
Kodak's former Vice President of IP Licensing and Transactions,
and Shih, Kodak's Senior Vice President.  To prepare for his
deposition, Shih spoke with two other Kodak representatives who
had major roles in negotiating the PLA.

Altek is not entitled to additional discovery to determine
what Kodak and Altek said to each other before executing the
PLA.  "Because parties are entitled to rely on the
enforceability of written agreements, parol evidence is
admissible to aid in the interpretation of a contract only when
the language of the contract is ambiguous."  Galli v. Metz, 973
F.2d 145, 153 (2d Cir. 1992).  Where, as here, the language of
the contract is unambiguous, parol evidence is not admissible.
In any event, the Rule 56(d) application may also be denied for
entirely separate reasons.

Altek has also not shown that it needs additional discovery
from Kodak to learn what Altek itself told Kodak.  No showing
has been made that Altek could not obtain this information from
its own employees and representatives.  In negotiations over the
PLA in 2004, Altek was represented primarily by two employees --
P.J. Chang ("Chang") and Michael Chen ("Chen") -- who are no

longer employed by Altek.  Altek claims that it cannot obtain
this information from either Chang or Chen because Chang is
uncooperative and Chen has been only partially cooperative.
Altek's counsel, however, has admitted receiving "some
information" from Chen on the parties' communications regarding
the negotiation and interpretation of any agreements between
them.  In addition, Chen has accepted representation by Altek's
counsel.  Furthermore, Altek has not shown that it even asked
the Kodak deponents if Altek ever conveyed to Kodak its
interpretation of open market price as a "retail price."

        There is also no need for additional discovery into whether
Altek ever communicated to Kodak that Altek's board of directors
had not approved the PLA.  In his deposition, Altek's corporate
representative admitted that no one from Altek had ever told
Kodak that Altek's board of directors had not approved the final
version of the PLA.  In any event, nothing in this Opinion's
analysis relies on this point.  As explained above, Altek's
president had implied and apparent authority to enter into the
PLA and Altek is not entitled to raise the nonoccurrence of
board approval as a basis for avoiding its obligations under the
PLA.

        Finally, Altek had a full opportunity to question both
Kodak witnesses regarding any definition that Kodak provided to
Altek of the term "open market price."  Pointedly, Altek has not

offered any evidence that it asked either witness whether Kodak ever told Altek that it understood or intended the term to refer to a <u>retail price</u>.  In conclusion, there is no need for additional discovery prior to a ruling on the present motions.


CONCLUSION

The plaintiff's February 1 motion for partial summary judgment is granted.  The defendant's February 1 motion for partial summary judgment is denied.


SO ORDERED:

Dated:   New York, New York
         March 29, 2013


_____
                DENISE COTE
        United States District Judge